## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF SOUTH CAROLINA

In re:

Shirley T. Sherrod,

                            Debtor.

C/A No. 23-03221-EG

Chapter 13

**ORDER CONFIRMING AMENDED
CHAPTER 13 PLAN**

**THIS MATTER** comes before the Court upon the Pre-Confirmation Modified Chapter 13

Plan ("Amended Plan")[1] filed by Shirley T. Sherrod ("Debtor" or "Sherrod") and the Renewed

Objection to Confirmation of Plan ("Renewed Objection")[2] filed by creditor Michael S. Sherman,

D.O., P.C., and Michael S. Sherman, D.O. (collectively, "Sherman").  Sherman, who holds an

unsecured claim in the amount of $1,556,114.71 (the "Sherman Claim"),[3] primarily objects to

confirmation on the grounds that Debtor did not file this case or propose the Amended Plan in

good faith as required by 11 U.S.C. § 1325(a)(3) and (7).  On June 6, 2024, the Court held the

confirmation hearing.  Counsel for Debtor and Sherman were present at the hearing, as well as the

Chapter 13 Trustee and his counsel.  Debtor also appeared remotely by videoconference.[4]  After

hearing the parties' arguments and testimony from Debtor, the Court took the matter under

advisement.

    This Court has jurisdiction over this contested matter pursuant to 28 U.S.C. §§ 157 and

1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (L), and (O).  Based on the

---

[1] ECF No. 67, filed Apr. 24, 2024.
[2] ECF No. 72, filed May 30, 2024.
[3] POC No. 4-1, filed Jan. 3, 2024.
[4] Debtor filed a request to appear for the hearing remotely by video, explaining that she was still recovering from foot surgery and had limited mobility due to her surgery and several heart related conditions.  ECF No. 75.  The parties all consented to allow Debtor to appear and testify remotely, and the Court granted the request.  ECF No. 76.

evidence admitted by stipulation of the parties[5] and the record before it, the Court finds that Debtor has satisfied the requirements for confirmation under 11 U.S.C. § 1325, as explained herein. Pursuant to Fed. R. Civ. P. 52, which is made applicable to this contested matter by Fed. R. Bankr. P. 7052 and 9014(c), the Court makes the following findings of fact and conclusions of law as set forth below.[6]

## FACTUAL BACKGROUND

### A. Sherman's Litigation History with Debtor

To understand the basis of Sherman's Renewed Objection, it is necessary to delve into this creditor's lengthy history with Debtor spanning more than 16 years. Once colleagues in the field of ophthalmology, Sherman purchased Debtor's Michigan medical practice for $245,000.00 on or about May 23, 2008.[7] Approximately five months after the transaction, Sherman sued Debtor for breach of contract, commencing state court litigation in Michigan (the "Michigan Litigation"). The Michigan Litigation continued for more than a decade, ultimately concluding in September of 2019—after the award of various judgments and appeals affirming the lower courts' decisions. During that time, Sherman sold Sherrod's former medical practice to a third party for $125,000.00.[8]

Sherman's pleadings in this case paint an ugly picture of the parties' long-winded, contentious litigation. Primarily relying on the description of events set forth in the Declaration of his Michigan Litigation counsel, Thomas G. McNeill ("McNeill's Declaration"),[9] Sherman's

---

[5] *See* ECF No. 77, filed June 4, 2024 (Joint Statement of Dispute).

[6] To the extent the following findings of fact are conclusions of law, they are adopted as such, and vice versa. The Court has previously entered an Order Overruling objection to Debtor's Claim for Exemptions, which contained finding of facts which are hereby incorporated into the record. *See* ECF No. 56, as amended by ECF No. 57.

[7] Creditor's Ex. 1-2, 7-9 (Plaintiffs-Appellee's Brief on Appeal, filed with the Michigan Court of Appeals on Aug. 11, 2023).

[8] *Id.* at 15.

[9] Creditor's Ex. 1 (Declaration of Attorney Thomas G. McNeill, dated Aug. 9, 2023).

Renewed Objection alleges that during the course of the Michigan Litigation, Debtor intentionally staged multiple fainting spells, continuously avoided service, failed to appear for or actively fled from numerous creditor's examinations, and refused to disclose requested information. McNeill's Declaration notes that the trial court in the Michigan Litigation admonished Sherrod multiple times, issued two civil contempt orders for her failure to provide financial records, and issued several bench warrants compelling her to attend creditor examinations.[10] McNeill's Declaration further states that many of Sherrod's lawyers withdrew from representing her during the Michigan Litigation.[11]

The Michigan Litigation resulted in three final judgments—the 2014 Judgment, the 2019 Damages Judgment, and the 2019 Attorney's Fee Judgment—which, along with accrued post-judgment statutory interest, form the basis of the Sherman Claim.[12] According to McNeill's Declaration, the amount owed has been offset by the amounts Sherman collected from the proceeds of a $250,000.00 bond Debtor was required to post in order to bring her second state court appeal, as well as "a $50,000 garnishment from a personal account Sherrod held at SunTrust Bank in Charleston, South Carolina, into which she deposited a pension fund distribution that she made to herself."[13] Sherman has attempted to collect on the judgments by starting foreclosure proceedings on Debtor's residence in Michigan,[14] seeking garnishment of pension funds,[15] and subpoenaing information about Debtor's personal accounts with various financial institutions.[16]

---

[10] *Id.* ¶ 10.

[11] *Id.* at 7.

[12] *See* attachment to POC No. 4-1.

[13] Creditor's Ex. 1, 3. The "Statement of Interest and Charges as of October 25, 2023" attached to Sherman's Proof of Claim reflects credits of $250,000.00 and $49,248.71 towards the collective judgment balance, leaving a total unsecured claim of $1,556,114.71.

[14] *See* Creditor's Ex. 1-8, ¶ 3 (Sherman's Motion to Dismiss Debtor's first bankruptcy case).

[15] *See* Creditor's Ex. 3-A, 3 (Summary Judgment opinion issued by the Illinois District Court in the ERISA Litigation on Mar. 31, 2022).

[16] See Creditor's Ex. 1, 7

On September 19, 2023, Sherman domesticated the Michigan Judgment in South Carolina pursuant to the Uniform Enforcement of Foreign Judgments Act, S.C. Code Ann. § 15-35-900, *et seq.*, by filing a Notice of Filing of Foreign Judgment and supporting affidavit in the Court of Common Pleas for Charleston County.[17]

### B.  The ERISA Litigation

Since 2016, Debtor has also been involved in extensive litigation concerning a pension fund.  When Debtor was the sole owner of her medical practice, the Shirley T. Sherrod M.D., P.C. Target Benefit Pension Plan and Trust (the "Pension Plan") was established to provide retirement benefits to certain employees, including Debtor.   The Pension Plan, which is considered a "qualified plan" under the Employee Retirement Income Security Act of 1974 (ERISA), has been the subject of ongoing litigation (the "ERISA Litigation") brought by the Department of Labor (the "DOL") in the U.S. District Court for the Northern District of Illinois ("Illinois District Court").[18]  The DOL filed the complaint seeking, among other things, to: (a) remove Debtor and the Pension Plan's previous administrator, Leroy Johnson ("Johnson"), from any fiduciary position in connection with the Pension Plan and enjoin them from serving as fiduciary for any ERISA plan in the future; (b) appoint an independent fiduciary to administer the Pension Plan, conduct an accounting, issue distributions, and terminate the Pension Plan; and (c) allow for setoff of Debtor's Pension Plan account for all fees and expenses of the independent fiduciary.

In 2022, the Illinois District Court granted the DOL's motion for summary judgment and request for injunctive and other equitable relief, which included (1) removing Debtor and Johnson

---

[17] Sherman, however, was unable to serve Debtor with the South Carolina Notice of Filing of foreign judgment as of the date this case was filed.  *See* Renewed Objection at ¶ 5.

[18] *See Su v. Sherrod et al.*, N.D. Ill. C/A No. 1:16-cv-04825.  Both Debtor and the "Shirley T. Sherrod, M.D., P.C. Target Pension Plan" are among the named Defendants. While some of the orders were not introduced into evidence at the hearing, the Court takes judicial notice of the filings in the ERISA Litigation as they were also referenced in other documents introduced into the record.

as fiduciaries of the Pension Plan; (2) appointing AMI Benefit Plan Administrator, Inc. ("AMI") as the independent fiduciary tasked with administering and, ultimately, liquidating and distributing the Pension Plan's assets to its eligible beneficiaries; and (3) requiring Debtor and Johnson to pay AMI's fees and reasonable expenses.  Debtor and Johnson appealed, and the Illinois District Court granted a stay of execution of the final judgment ("Stay of Execution") ordering that AMI hold off on disbursing Pension Plan assets until further order of the court.[19]  While appeals were pending, the Stay of Execution was modified twice to allow AMI to make required annual minimum distributions to the Pension Plan beneficiaries in 2022 and 2023.[20]  As reflected on the ERISA Litigation docket, the Illinois District Court's decisions were appealed and subsequently affirmed by the Seventh Circuit.  Debtor attempted to appeal the Circuit Court's decision, but the U.S. Supreme Court denied *certiorari* on or about December 11, 2023, thus concluding all appeals of the judgment.

In August of 2023—after the Seventh Circuit affirmed the Illinois District Court's decision—Sherman filed a Motion to Intervene in the ERISA Litigation.[21]  Arguing that, as a judgment-creditor, he held a valid interest in Sherrod's Pension Plan distribution and would suffer prejudice if he could not collect his judgment from those funds, Sherman asked the Court to: (1) order the full payment of Pension Plan funds to all participants except Sherrod, leaving Sherrod as the sole remaining participant; (2) enter a declaratory judgment finding that the Pension Plan is a "plan without employees" and no longer protected by ERISA's anti-alienation provision; and (3) award Sherman the amount due under the final judgments in the Michigan Litigation.

---

[19] N.D. Ill., C/A No. 1:16-cv-04825, ECF No. 318.
[20] N.D. Ill., C/A No. 1:16-cv-04825, ECF Nos. 337 and 377.
[21] N.D. Ill., C/A No. 1:16-cv-04825, ECF No. 358.

The Illinois District Court denied Sherman's Motion to Intervene on March 30, 2024, [22] finding not only the motion to be untimely, but also that "Sherman does not have a cognizable interest in funds that ERISA protects from judgment-creditors such as himself." As the Illinois District Court explained:

> Sherman argues that denying leave will cause him prejudice because if he cannot extract funds from the Plan, then he will never collect from Sherrod. But, even if this is true, it does not amount to actual prejudice. Sherman's argument presupposes that he has a legitimate stake in the Plan and its assets—one that could give rise to prejudice. However, as explained below, Sherman's interest is not cognizable.
> . . .
> Seeking intervention is simply Sherman's means of increasing the odds that he can collect the distribution to which he believes he is entitled.
>
> . . .
> [A]t root, his purported interest in Sherrod's distribution is not legally protectable. To the contrary, it sharply conflicts with ERISA's "anti-alienation" provision. Under that provision, "[e]ach pension plan shall provide that benefits provided under the plan may not be assigned or alienated." 29 U.S.C § 1056(d). This requirement "reflects a considered congressional policy choice, a decision to safeguard a stream of income for pensioners . . . *even if* that decision prevents others from securing relief for the wrongs done them." *Guidry v. Sheet Metal Workers Nat. Pension Fund*, 493 U.S. 365, 376 (1990) (emphasis added). Here, Sherman essentially asks the Court to facilitate an end run around ERISA's anti-alienation provision—first, by delaying Sherrod's distribution such that she is the only remaining Plan participant; second, by declaring that the Plan is a "plan without employees" and thus not subject to ERISA's anti-alienation requirement; and finally, with that statutory obstacle removed, by ordering a transfer of funds in the amount that Sherrod owes Sherman. The Court declines to effect assignment by another name. . . . Accordingly, the Court finds that Sherman does not have a valid interest in funds that ERISA explicitly guards from judgment-creditors.[23]

On March 31, 2024, the Illinois District Court entered an order confirming that the Stay of Execution was moot and stating that AMI "may proceed with distributions to all Plan participants with the exception of Sherrod," from whose interest AMI's fees and expenses will be paid.[24] As

---

[22] N.D. Ill., C/A No. 1:16-cv-04825, ECF No. 386.

[23] *Id*. at 3-5.

[24] N.D. Ill., C/A No. 1:16-cv-04825, ECF No. 387.

of the entry of this Order, Sherrod's remaining Pension Plan interest has not been distributed and the next status conference for the ERISA Litigation is scheduled for July 9, 2024.[25]

### C. Debtor's Prior Bankruptcies

Aside from this case, Debtor has filed for bankruptcy three other times in the past 13 years. With the assistance of counsel, Debtor first filed for Chapter 13 bankruptcy in the Northern District of Illinois on May 24, 2011.[26]   According to Debtor's testimony, while she has been living in South Carolina for the past 14 years, she temporarily resided in Chicago, Illinois for some periods of time while undergoing medical treatment.   The Renewed Objection asserts that Debtor filed her first bankruptcy "for the purpose of stopping Sherman's attempt to enforce the [Michigan] trial court judgment without posting a bond [of appeal]," though Sherman's motion to dismiss filed in that case notes that a foreclosure sale for Debtor's Michigan property was scheduled to take place on June 3, 2011.[27]   In that case, eight claims were filed, including a secured claim filed by First Federal of Charleston and a priority tax claim filed by Michigan's Department of Treasury.   As the court docket for that case reflects, Sherman not only filed a proof of claim, but also a Motion to Dismiss, a Motion for Relief from Stay as to Real Estate, an Objection to Debtor's Claim of Exemptions, and an Objection to Confirmation of Plan, as well as replies to motions brought by other parties.   On December 5, 2011, the case was dismissed due to Debtor's failure to make timely plan payments pursuant to 11 U.S.C. § 1326(a).[28]

After filing another appeal in the Michigan Litigation, Debtor, through counsel, filed her second bankruptcy case in the Northern District of Illinois on March 13, 2014, this time under

---

[25] *See* N.D. Ill., C/A No. 1:16-cv-04825, ECF No. 389.

[26] Bankr. N.D. Ill., C/A No. 11-21975.

[27] Creditor's Ex. 1-8, ¶ 3.  *See also* Creditor's Ex. 1-12, ¶ 15b (Sherman's Response to the U.S. Trustee's motion to dismiss Debtor's second bankruptcy case, which notes that Sherman attempted to foreclose on the property).

[28] Bankr. N.D. Ill., C/A No. 11-21975, ECF No. 78.

Chapter 11.[29]  The court docket for that case reflects that among other pleadings, Sherman filed

an Objection to Debtor's Application to Employ her appellate counsel, an Objection to Debtor's

Motion for Relief from Stay as to her pending appeal in Michigan state court, a Motion for Relief

from Stay as to Sherman's action to dismiss Debtor's pending appeal, a motion to conduct a Rule

2004 examination of Debtor, an Objection to Debtor's Claim of Exemptions, two Motions to

Compel, an Objection to Debtor's attorney's Motion to Withdraw as Attorney, a Motion for

Preliminary Injunction, a Motion for Temporary Restraining Order, a Motion for Sanctions against

Debtor, and a Motion to Appoint Chapter 11 Trustee.  In that case, Debtor brought an adversary

proceeding against Sherman, his medical practice, and the bond surety Debtor paid to procure a

supersedeas bond for her pending appeals, seeking to enjoin payment on the bond to Sherman.[30]

The adversary proceeding was subsequently dismissed with prejudice upon Sherman's motion.[31]

On May 30, 2014, the United States Trustee moved to convert or dismiss Debtor's second

bankruptcy case for cause due, among other things, to Sherrod's failure to appear at the 341

meeting, provide various documents as requested, file operating reports, and file correct

information on her schedules.  The case was dismissed on June 25, 2014.[32]

On October 8, 2019, shortly after the 2019 judgments were entered in the Michigan

Litigation, Debtor filed a *pro se* Chapter 13 case in the District of South Carolina.[33]  The creditors

who filed proofs of claim in Debtor's third bankruptcy case included Sherman, American Express

National Bank, the DOL for the benefit of the Pension Plan trust, and the successor to the bond

surety.  Sherman's claim alone, which was filed via two separate proofs of claim reflecting a total

---

[29] Bankr. N.D. Ill., C/A No. 14-08950 (captioned "Shirley Thereasa Sherrod MD PC").
[30] Bankr. N.D. Ill., Adv. Pro. No. 14-00192, ECF No. 1, filed March 18, 2014.
[31] Bankr. N.D. Ill., Adv. Pro. No. 14-00192, ECF No. 55, entered May 28, 2014.
[32] Bankr. N.D. Ill., C/A No. 14-08950, ECF No. 124.
[33] C/A No. 19-05309-jw.

amount claimed of $1,944,809.78, surpassed the $419,275.00 statutory cap on noncontingent, liquidated debts in effect at the time. *See* 11 U.S.C. § 109(e) (currently reflecting a statutory cap of $2,750,000). Additionally, Debtor failed to file schedules and statements within 45 days of the case's commencement, rendering the case subject to automatic dismissal under 11 U.S.C. § 521(i). Both the Trustee and Sherman filed motions to dismiss the case, and an order granting Sherman's motion and dismissing the case pursuant to 11 U.S.C. §§ 109(e) and 521(i) was entered on December 2, 2020.[34]

### D. Current Bankruptcy Case

Debtor filed a voluntary petition under Chapter 13 of the Bankruptcy Code, with the assistance of counsel, on October 25, 2023 (the "Petition Date"), commencing this case. Debtor's original schedules and statements ("Original Schedules"),[35] disclosed interests in two pieces of real property that were also disclosed in her prior cases: (1) an unencumbered condo where Debtor currently resides in Johns Island, South Carolina ("Debtor's Residence"), with an estimated value of $250,000.00; and (2) a house in Bloomfield Hills, Michigan (the "Bloomfield Hills Property"), with an estimated value of $150,000.00 and fully encumbered, that Debtor noted would be surrendered. The only other substantial asset Debtor listed in the Original Schedules was her Pension Plan interest, which she estimated as having a value of $1,800,000.00. The original Schedule I noted that Debtor is retired and listed $1,900.00 per month from Social Security as her only income. Based on the expenses listed in the Original Schedule J, Debtor had a monthly net income of $60.00.

---

[34] C/A No. 19-05309-jw, ECF No. 35.
[35] ECF No. 12.

Aside from the Sherman Claim, American Express National Bank also timely filed three unsecured claims totaling $15,962.61.[36]  Two claims have been filed since the January 3, 2024 deadline for non-governmental claims: (1) a secured claim filed by L.J. Consulting Services, LLC for the $171,514.24 balance on a mortgage lien attached to Debtor's Bloomfield Hills Property,[37] which has not been challenged; and (2) an unsecured claim for $136,628.70 filed by Johnson for legal fees that he alleged Debtor had verbally agreed to repay,[38] which has been disallowed.[39]

Both the Trustee and Sherman filed objections to Debtor's claims of exemption for the Pension Plan interest, though the Trustee later withdrew his objection.[40]  The Court overruled Sherman's objection to exemption without prejudice,[41] noting that the parties had already stipulated that the Pension Plan was an ERISA qualified plan, meaning that Debtor's interest therein was excluded from the bankruptcy estate according to the U.S. Supreme Court's decision in *Patterson v. Shumate*.  *See* 504 U.S. 753 (1992) (finding ERISA to be "applicable non-bankruptcy law" for the purposes of § 541(c)(2) in a case where the Chapter 7 trustee sought to recover the debtor's interest in an ERISA plan for inclusion in the bankruptcy estate).

On January 2, 2024, Debtor filed an adversary proceeding against AMI, seeking turnover of the funds being held in the Pension Plan, which Debtor's Complaint claimed is property of the bankruptcy estate.[42]  AMI filed a motion to dismiss the adversary proceeding based on the Court's prior order determining that Debtor's Pension Plan interest is not property of the bankruptcy estate and therefore cannot be subject to turnover under 11 U.S.C. § 542.[43]  At the hearing on AMI's

---

[36] POC Nos. 1-3, as amended.
[37] POC No. 5, as amended.
[38] POC No. 6.
[39] ECF No. 63.
[40] ECF Nos. 20 (withdrawn at ECF No. 46) and 25.
[41] ECF No. 57.
[42] Adv. Pro. No. 24-80002, ECF No. 1.
[43] Adv. Pro. No. 24-80002, ECF No. 7.

motion, Debtor's counsel acknowledged that dismissal of the Complaint pursuant to Fed. R. Civ. Pro. 12(b)(6) was appropriate based on the Court's prior ruling as to Debtor's claim for exemptions.  The Court entered an order dismissing the adversary proceeding without prejudice on March 26, 2024.[44]

Debtor's first proposed Chapter 13 plan (the "First Plan") was filed on November 17, 2023.[45]  The First Plan provided that Debtor would make payments of $50.00 per month to the Trustee for 60 months and, to satisfy the best interest of creditors test under 11 U.S.C. § 1325(a)(4), proposed that once the Pension Plan funds were distributed, Debtor would use those funds to make a lump sum payment of $146,687.50 to the Trustee, an amount which Debtor asserted reflected the liquidation value of her non-exempt assets based on the property values stated in her Original Schedules.  The Trustee filed an objection to confirmation in which he contested the liquidation value payment terms in large part because there was no deadline provided by when the lump sum would need to be paid and the Pension Plan funds appeared to be unreachable due to the Illinois District Court's Stay of Execution.[46]  The Trustee also objected to the stated liquidation value of the estate based on information that suggested Debtor had undervalued the property in her Original Schedules.  Finally, the Trustee's objection suggested that the "proposed payment of $50.00 per month while creditors wait for possible exempt proceeds to be received after over 6 years of litigation in [the Illinois District Court] causes undue delay and appears to show a lack of good faith in the filing of the case and the filing of the plan."  Sherman also filed an Objection to Confirmation, which included supporting exhibits and raised similar grounds for denying

---

[44] Adv. Pro. No. 24-80002, ECF No. 19.
[45] ECF No. 14.
[46] ECF No. 16, filed Dec. 29, 2023.

confirmation but elaborated more extensively on the argument that this case and the First Plan were not filed in good faith as required under § 1325(a)(3) and (7).[47]

At the confirmation hearing held on March 7, 2024, the Trustee, Debtor's counsel, and Sherman's counsel appeared.  Debtor had planned to appear and provide testimony, but shortly after arriving at the courthouse in Charleston, she fell ill and had to be taken to the hospital by ambulance.  The Court proceeded with the hearing, initially noting for the record that based on the pleadings from the ERISA Litigation, which Sherman had attached as exhibits to his Objection to Confirmation, Debtor had several prior incidents of falling ill or fainting at hearings that occurred under suspicious circumstances.  However, the Court was later informed by marshals who were present outside the courtroom and assisted Debtor that in this instance, Debtor's heart monitor began beeping and she was having trouble breathing, so emergency medical services ("EMS") were called despite Debtor's protest.  When EMS arrived, they found that Debtor's blood pressure was low and said she was experiencing heart arrhythmia, prompting them to transport her to the hospital.

During the hearing, the Trustee expressed concern that Debtor had not only undervalued her South Carolina residence but had also failed to disclose a property still registered to Debtor in Michigan and did not report her HOA fees in her monthly expenses.  Debtor's counsel indicated that Debtor intends to surrender two properties in Michigan, the Bloomfield Hills Property that was disclosed in Schedule A/B and another property that was not included in the Original Schedules (the "Doris Street Property").  He explained that the Doris Street Property was Debtor's parents' house deeded to her in probate, and it was omitted from the Original Schedules despite having been disclosed in Debtor's prior bankruptcies because he was led to believe that the

---

[47] ECF No. 18, filed Jan. 3, 2024.

property was no longer registered in Debtor's name.  Debtor's counsel also acknowledged that Debtor was required to pay two separate annual HOA fees on her Johns Island condo and explained that she had planned to testify as to how she would be able to pay those fees, which were set to increase within the next few months.

To address the liquidation value estimated in the First Plan, Sherman's counsel elicited testimony from an expert witness, Burk Herrin ("Herrin"), who had performed an appraisal of Debtor's Residence.[48]  Herrin estimated that the property was worth approximately $380,000.00—over $100,000 more than the estimate Debtor gave in her original Schedule A/B.  He explained that his appraisal factored in a substantial discount for the repairs and renovations that would be necessary for a hypothetical buyer to bring the property to good condition.  The Appraisal Report that Herrin prepared rated the condition of Debtor's Residence as poor and noted that it did not appear to have been updated since Debtor purchased it in 1987, as there are several deferred maintenance items, including leaky appliances and an HVAC system in need of replacement. Photographs from the inside of Debtor's Residence included in the Appraisal Report show large piles of things filling the 913 sq. ft. condo, some of which Debtor had covered by sheets or tarp. Having no other evidence before it to contest the expert's valuation of Debtor's Residence, the Court indicated, and the parties all agreed, that the First Plan was not confirmable.

The Court thereafter denied confirmation and entered an order indicating that the First Plan did not comply with the requirements for confirmation and giving Debtor time to file an amended plan.[49]  Debtor's second proposed Chapter 13 plan, filed on March 18, 2024, cured the liquidation value issue by increasing the lump sum payment to $295,791.67 but decreased the term length for

---

[48] *See* ECF No. 45, Ex. A (Appraisal Report).
[49] ECF No. 51, entered Mar. 7, 2024.

making plan payments to 11 months.[50]  Debtor also filed amended schedules on March 18, 2024,

and May 2, 2024.[51]  The amended Schedule A/B reported the Doris Street Property and listed it as

having an estimated value of $500.00.  The amended Schedule D also added Marion Woodfork as

having a mortgage on the Doris Street Property in the amount of $10,000.00.   The amended

Schedule J updated Debtor's expenses to include the prorated monthly amount of HOA fees due

based on the 2024 annual assessment, changing her monthly net income to negative $367.00.

### E.  The Amended Plan and Sherman's Objection to Confirmation

Debtor filed her third Chapter 13 plan, which is currently before the Court, on April 24,

2024.  The Amended Plan provides for payments of $50.00 per month for 36 months.  Additionally,

Section 2.4 provides for a lump sum payment to the Trustee as follows:

> The Debtor is involved in ongoing litigation concerning her rights as it pertains to
> her interest in the Shirley T. Sherrod, MD, PC Target Benefit Pension Plan and
> Trust (the "Plan"). The Debtor believes that her current account balance is in excess
> of One Million Seven Hundred Thousand ($1,700,000.00) Dollars. These funds are
> held in a ERISA qualified plan and the Debtor. The Bankruptcy Court has ruled
> that her interest in this account is not property of the bankruptcy estate and therefore
> no exemption needs to be claimed in this property. The United States District Court
> for Northern District of Illinois Eastern Division ([*Su*] *v. Sherrod*, 1:16-cv- 04825)
> has effectively frozen the Debtor's rights and access to her funds. The Debtor
> believes that this litigation will be concluded during the pendency of this Chapter
> 13 plan. The Debtor agrees that on or before October 25, 2024 the Debtor will make
> a lump sum payment to the Chapter 13 Trustee in the amount of $295,791.67. This
> amount constitutes the liquidation value of her non-exempt assets as well as
> applicable Chapter 13 Trustee compensation. The Debtor agrees to forward to the
> Trustee, within two days of the Debtor's receipt, a copy of the ERISA fund
> distribution check or confirmation of the rollover for the ERISA distribution to the
> Debtor's IRA account. The Debtor agrees to pay the amount indicated above within
> thirty (30) days of receipt of the ERISA distribution or October 25, 2024, whichever
> is earlier.

By these terms, the Amended Plan offers a total payment of $297,591.67, the bulk of which will

be handed over to the Trustee within the next 5 months.  According to the Court's calculations,

---

[50] ECF No. 60.
[51] ECF Nos. 62 and 71.

based on the proofs of claims filed, this translates to a proposed repayment of approximately 15-18% of unsecured claims.

Sherman filed the Renewed Objection, primarily arguing that confirmation of the Amended Plan should be denied because "both the Plan and this case were filed in bad faith" and thus Debtor cannot satisfy her burden of proof on the confirmation requirements under 11 U.S.C. § 1325(a)(3) and (7). Sherman's argument largely relied upon the "suspicious" timing of Debtor's bankruptcy petitions, Debtor's misconduct during prior litigation with Sherman, and the assertion that "this bankruptcy case is, for all intents and purposes, essentially a two-party matter between Sherman and the Debtor in which the Debtor is attempting to leverage the protections afforded debtors under the Bankruptcy Code in order to perform an end-run around her liability to Sherman."[52] As an alternative to denying confirmation, Sherman requests, at a minimum, that the Court "condition confirmation of the Plan on a requirement that the proposed Plan payment from the Pension Plan be made directly from [AMI] to the chapter 13 trustee so that creditors can be ensured of receiving a disbursement from this case."[53] The Trustee did not object to the Amended Plan.

At the June 6, 2024 confirmation hearing on the Amended Plan, Debtor's counsel provided an update on the status of the ERISA Litigation and indicated that AMI will likely make a final recommendation for the disposition of Debtor's Pension Plan interest at the next status conference scheduled to take place in July. He further emphasized that Debtor is not doing anything to delay the distribution of the Pension Plan funds, as she wants to ensure she will receive the funds before the October deadline for making the lump sum payment to the Trustee. Trustee's counsel indicated that to the extent the funds are not received by the October deadline proposed in the Amended Plan, the Trustee's intention would be to file a motion to dismiss Debtor's case. With respect to

---

[52] ECF No. 72, 12.

[53] *Id.* at 13.

plan feasibility, the Trustee affirmed that Debtor is current on her monthly plan payments but needed her to testify as to her continued ability to make the plan payments despite her reported negative monthly net income. Debtor testified that she will be able to stay current with her payments even before she receives the remaining Pension Plan funds because her family would give her the money if needed. She stated that her family helps her pay for expenses from time to time, and there has never been an instance when they have not helped her when needed. Debtor further stated that she is current on her HOA regime fees, including the nearly $5,000.00 she had to pay recently.

Debtor testified that Sherman's collection efforts have been "very super aggressive," and every action she has taken throughout their litigation history was based upon the advice of counsel. Debtor asserted that she filed this bankruptcy case in response to Sherman's domestication of the Michigan judgments because she was afraid Sherman was going to take away the only place she has to live.[54] She affirmed that she will hand over the lump sum payment from her Pension Plan funds when they are disbursed, in accordance with the terms of the Amended Plan, as she does not want to risk losing her home should her case be dismissed before plan completion. Debtor also testified that her accountant has estimated she will have to pay a 30% income tax rate on the Pension Plan funds she receives. Her counsel indicated that means she will need to withdraw $400,000.00 from the funds to make the nearly $300,000.00 payment to the Trustee, and Debtor confirmed that she is willing to incur that cost in order to make her plan successful.

Debtor also addressed the subject of the mandatory distribution she received from the Pension Plan in December of 2023, which she said was approximately $50,000.00. She estimated that she has less than $5,000.00 left from that amount because, after accounting for taxes, she spent

---

[54] In addition to being encumbered by mortgages, Debtor testified that her other properties in Michigan are run down and would require a complete tear down or significant work.

most of the net proceeds on bills and medical expenses incurred this year.  When asked how she received the mandatory distribution, Debtor indicated that she was given a check that she had a relative or friend cash for her, though she could not recall who specifically.

On cross examination, Sherman's counsel asked Debtor about post-petition charges made with her American Express credit card, which were listed in a billing statement attached to American Express's proof of claim.  The post-petition charges totaled approximately $3,700.00. Debtor did not dispute the charges but indicated that she is not the only person who uses that credit card, as she had given it to family members to buy things for her in the past.  Sherman's counsel later asked if she had ever refused to appear for a creditor examination, to which she repeatedly replied, "Never," even after he showed her exhibits containing a bench warrant issued for her failure to appear in the Michigan Litigation and an order dismissing her state court appeal under the disentitlement doctrine for being a "fugitive of justice."  Debtor stood firm and accused Sherman's counsel of presenting exhibits that were one-sided and disingenuous, intentionally compiled without other parts of the record that would provide fuller context.  Because Debtor had testified that she has lived in her current residence for the last 14 years, Sherman's counsel also questioned why she had filed two bankruptcies in Illinois less than 14 years ago.  Debtor explained that there were periods of time when she had lived in Illinois for health reasons, but she could not recall when exactly those periods were.

Debtor testified that she is 78 years old and indicated that she has several health issues limiting her mobility, vision, and hearing.  Debtor did not have the exhibits readily in front of her but eventually gained access to the pdfs Sherman's counsel provided.  Even then, it took a frustratingly long amount of time for her to locate the exhibits to which Sherman's counsel was referring her during cross examination, though Debtor indicated that her eyesight was limited, and

it appeared she was scrolling through the long exhibits on her computer or phone one page at a time.  She also asked both her counsel and Sherman's counsel to repeat some of the questions asked because she was having trouble hearing them well enough.

Upon the Court's inquiry of Sherman's counsel as to how his client would be worse off if the case is dismissed in October, should Debtor fail to make the lump sum payment by the deadline, rather than now, he indicated that if the case is dismissed immediately, his client would have the opportunity to pursue "options" to recover from Debtor's Pension Plan funds before Debtor rolls those funds over to an IRA.  Specifically, Sherman's counsel indicated that if the Pension Plan is declared a "plan without employees," it will no longer be subject to ERISA's anti-alienation provision that currently prevents Sherman from attaching a lien on the funds.  Sherman's counsel further stated that if the case is dismissed, he believes his client would proceed with perfecting the domestication of his judgment against Debtor in South Carolina to obtain a lien on Debtor's Residence, though Sherman's counsel acknowledged that Sherman would receive more or less the same amount from a foreclosure sale as he would under the Amended Plan.

At the end of the hearing, Trustee's counsel indicated that the Trustee recommends confirmation of Debtor's Amended Plan if the Court overrules Sherman's Renewed Objection.

## <u>CONCLUSIONS OF LAW</u>

**I.    The Amended Plan Meets the Standards of 11 U.S.C. §§ 1325(a)(3) and (7)**

Section 1325(a) of the Bankruptcy Code sets forth a list of factors that must be met for the court to confirm a Chapter 13 plan.  Among other things, it provides:

Except as provided in subsection (b), the court shall confirm a plan if—

(3) the plan has been proposed in good faith and not by any means forbidden by law; [and]
. . .

(7) the action of the debtor in filing the petition was in good faith.

11 U.S.C. § 1325(a)(3), (7).  Thus, the Bankruptcy Code imposes the obligation of good faith on

a debtor at two crucial stages of the case—the debtor must file both the petition for Chapter 13

bankruptcy and the Chapter 13 plan in good faith.  *In re Brandland*, 570 B.R. 203, 217 (Bankr.

E.D. Va. 2017) (quoting *In re Colston*, 539 B.R. 738, 746 (Bankr. W.D. Va. 2015)).

Proposing a plan in good faith under § 1325(a)(3) entails "mak[ing] an honest effort to

repay [the debtor's] creditors, for the underlying purpose of a Chapter 13 plan has always been

'the sincerely-intended repayment of pre-petition debt consistent with the debtor's available

resources.'"  *In re McGillis*, 370 B.R. 720, 750 (Bankr. W.D. Mich. 2007) (quoting *Metro*

*Employees Credit Union v. Okoreeh–Baah* (*In re Okoreeh–Baah*), 836 F.2d 1030, 1033 (6th Cir.

1988)). In determining whether a plan has been proposed in good faith, courts in the Fourth Circuit

employ a "totality of the circumstances" analysis, taking into account a non-exhaustive list of

factors including:

1. The percentage of proposed repayment,
2. The financial situation of the debtor,
3. The period of time over which payment will be made,
4. Debtor's employment history and prospects,
5. The nature and amount of unsecured claims,
6. Past bankruptcy filings of debtor,
7. Debtor's honesty in representing facts,
8. Any unusual or exceptional problems facing the particular debtor,
9. The debtor's pre-filing conduct, and
10. The possibility of non-dischargeability of any debts in a Chapter 7 proceeding.

*See In re Pizzo*, 628 B.R. 811, 818 (Bankr. D.S.C. 2021) (citations omitted).

The Court must analyze each case on its own facts "to determine whether there has been 'an abuse

of the provisions, purpose, or spirit' of Chapter 13 in the proposal or plan."  *In re Anstett*, 383 B.R.

380, 385 (Bankr. D.S.C. 2008) (quoting *Deans v. O'Donnell*, 693 F.3d 968, 972 (4th Cir. 1982));[55]

*Neufeld v. Freeman*, 794 F.2d 149, 152 (4th Cir. 1986); *In re Brandland*, 570 B.R. at 217-218

(dismissing Chapter 13 case due to debtor's failure to propose a confirmable plan after four tries,

coupled with the court's conclusion that the latest plan was not filed in good faith because debtor

had used super-discharge provision of Chapter 13 in an attempt to discharge otherwise

nondischargeable debt to ex-spouse and because of debtor's lack of candor in divorce

proceedings); *In re Pearson*, No. 10–05166–JW, 2010 WL 5169081, at *1 (Bankr. D.S.C. Oct. 18,

2010) (considering the totality of the circumstances and concluding that debtor had failed to meet

the requirements for plan confirmation under § 1325(a)(3) and (7)); *In re Allawas*, No. 07–06058–

HB, 2008 WL 6069662, at *5 (Bankr. D.S.C. Mar. 3, 2008) (holding that a Chapter 13 debtor,

whose plan provided for the retention and payment of a motor vehicle and a motorcycle when the

plan proposed only a 1% repayment to general unsecured creditors over five years, failed to meet

her burden of proving that the plan was proposed in good faith).  This is in line with the principal

purpose of the Bankruptcy Code: "to grant a 'fresh start' to the 'honest but unfortunate debtor.'"

*Dubois v. Atlas Acquisitions LLC* (*In re DuBois*), 834 F.3d 522, 526 (4th Cir. 2016) (quoting

*Marrama v. Citizens Bank of Mass.*, 549 U.S. 365, 367 (2007)).

Section 1325 also requires that good faith is present in the filing of the Chapter 13 petition.

11 U.S.C. § 1325(a)(7).  Subsection (a)(7) was added as part of BAPCPA in 2005 and has since

provoked courts and commentators to discuss how the subsection interacts with § 1325(a)(3) and

§ 1307(c).  *See In re Colston*, 539 B.R. at 749-50 (citations omitted).  As courts have previously

noted regarding the confusion following the enactment of § 1325(a)(7), "'if a lack of good faith in

---

[55] This Court has previously held that the factors outlined in *Deans* are still relevant to consider when determining the "totality of circumstances" in cases filed after the effective date of the 2005 Bankruptcy Abuse Prevention and Consumer Protection Act (BAPCPA).  *In re Allawa*s, No. 07–06058–HB, 2008 WL 6069662, at *3 (Bankr. D.S.C. Mar. 3, 2008) (quoting *In re Edmunds*, 350 B.R. 636, 649 (Bankr. D.S.C. 2006)).

filing a chapter 13 petition mandates a denial of confirmation, it would appear that this defect would be irremediable,' and '[i]f so, a chapter 13 case in which the debtor is unable to confirm any plan warrants dismissal under section 1307(c).'" *In re Colston*, 539 B.R. at 750 (quoting *In re Manno*, No. 08–15588bf, 2009 WL 236844, at *7 n.9 (Bankr. E.D. Pa. Jan. 30, 2009)). Courts analyzing the good faith of a debtor under § 1325(a)(7) have employed a "totality of circumstances" test similar to the one employed for § 1325(a)(3). *See In re Page*, 519 B.R. 908, 914 (Bankr. M.D.N.C. 2014); *In re Pearson*, 2010 WL 5169081, at *1.

The ultimate burden of proof is on the Debtor, who must prove by a preponderance of the evidence that the plan complies with all the confirmation requirements, including the good faith requirement. *In re Pizzo*, 628 B.R. at 818; *In re Allawas*, 2008 WL 6069662, at *3. Here, the Court finds that Debtor has satisfied her burden as to all confirmation requirements. Most of the factors relevant to determining whether this case and Debtor's Amended Plan were filed in good faith weigh in favor of Debtor. According to the Court's calculations, Debtor's plan proposes to pay approximately 15-18% of unsecured claims—an amount that is neither nominal nor *de minimis*. Nothing in the record suggests that Debtor is living a luxury lifestyle beyond her means, in which case that percentage distribution might be low enough to signal a lack of good faith. To the contrary, Debtor's overall financial situation suggests that this proposal reflects a reasonable attempt to repay creditors within her means. After surrendering the two Michigan properties, Debtor's tangible assets will consist of an outdated one-bedroom condo, a 1998 Mercedes with over 225,000 miles, and various personal effects—in essence, just the basics. Debtor's budget provides for little beyond necessary expenses. Based on Schedule I, Debtor's Social Security benefits provide her with an annual income of $22,800.00, which is less than the current median

income for a household of one in South Carolina.[56]  Though Debtor will likely receive over $1

million from her Pension Plan interest, those funds are exempt under state law and, considering

her advanced age and health conditions, will probably be used for medical expenses and

maintaining her current standard of living in retirement.  Her voluntary commitment of Pension

Plan proceeds to fund her Amended Plan allows creditors to recover more than they typically

would from a below median income debtor.  Moreover, the Court does not find it to be a lack of

good faith that Debtor is only contributing the liquidation value of her non-exempt assets—the

minimum amount necessary to satisfy the best interest of creditors test—from her Pension Plan

funds, as the Court cannot force a debtor to pay more from excluded or exempt assets than they

are voluntarily willing to dedicate.  *See In re Miller*, 445 B.R. 504 (Bankr. D.S.C. 2011) (finding

that the debtor's failure to devote Social Security benefits to fund Chapter 13 plan did not evidence

a lack of good faith).

Given that Debtor falls below median income level, the proposed 36-month term length is

appropriate under the rules for determining the "applicable commitment period" pursuant to

§ 1325(b)(4).  The vast majority of repayment will occur within the next five months, and if it does

not, the case can be dismissed, and Sherman could then proceed with perfecting his judgment lien

on Debtor's Residence and/or pursuing any other available remedies outside of bankruptcy.

Sherman has articulated that if the case were dismissed, he would expect to get more or less the

same amount from foreclosing on Debtor's Residence as he would under the Amended Plan, and

it seems that waiting a few more months to collect is hardly cumbersome after waiting over a

decade to obtain his most recent monetary judgments against Debtor.  Sherman argues that he will

---

[56] Census Bureau data published on the U.S. Trustee Program website lists the median income for a household of one in South Carolina as $59,661.00.  The median income level applied to cases filed between May 15, 2023 and Oct. 31, 2023 is $59,511.00.  *See* U.S. Trustee Program, "Means Testing," https://www.justice.gov/ust/means-testing (last visited June 20, 2024).

experience further prejudice if forced to wait until October for the case to be dismissed because he will likely be precluded from pursuing his "options" to proceed against the Pension Plan funds under state law before Debtor rolls those funds into an IRA.  The Court is not persuaded by this argument, as it is not clear to the Court what those "options" would be.  Sherman's counsel suggested that one option would be to have a court determine that the Pension Plan is a "plan without employees" and therefore no longer subject to ERISA's anti-alienation provision under 29 U.S.C § 1056(d), in which case Debtor's interest would no longer be immune to attachment. However, the Illinois District Court already refused to grant such declaratory relief because it is "assignment by another name."  In denying Sherman's Motion to Intervene in the ERISA Litigation, the Illinois District Court also noted that Sherman "does not have a cognizable interest in funds that ERISA protects from judgment-creditors such as himself."  Any argument to the contrary would seem to violate the choice Congress made "to safeguard a stream of income for pensioners . . . even if that decision prevents others from securing relief for the wrongs done them." *Guidry v. Sheet Metal Workers Nat. Pension Fund*, 493 U.S. 365, 376 (1990).  Thus, it seems that this purported "option" would only result in further costly and vexatious litigation between the parties, possibly increasing the amount of Sherman's claim against Debtor as a result of mounting attorney's fees, with results that may ultimately not prove fruitful to him.

Sherman also claims that this case is really a two-party dispute, but other creditors have filed claims against Debtor.  Not only has American Express filed multiple claims, but there is also a substantial secured claim held by L.J. Consulting Services, LLC for a mortgage on Debtor's Bloomfield Property.  To date, no one has filed an objection to that claim.  Even if the Court were to accept Sherman's characterization that Debtor's bankruptcy is in essence a two-party dispute, that does not automatically preclude a finding of good faith.  It is common for bankruptcy cases to

involve one significant creditor whose claim dwarfs all others, and, as previously noted by another bankruptcy court in this Circuit, "[i]f every two-party dispute resulting in litigation automatically resulted in a bad faith filing, there would be little for this Court to do."  *In re Colston*, 539 B.R. at 751 (finding that the debtor's last-minute filing of the case, along with the de minimis offering to the creditor on a claim that would likely be nondischargeable in Chapter 7, supported denial of plan for lack of good faith).  Debtor's proposed repayment terms and lack of objection to Sherman's claim suggest that Debtor "is not trying to use bankruptcy to avoid payment of the debt . . . but instead is seeking to find a way to pay back this substantial debt . . . over time" while maintaining a decent standard of living.  *In re Moore*, 635 B.R. 451, 454 (Bankr. D.S.C. 2021). While the Court recognizes the egregious and at times perplexing conduct Debtor apparently engaged in during past litigation, the facts in this case bolster Debtor's testimony that her motivation for filing is to save her home and obtain a fresh start after 16 years of Sherman's continuous efforts to collect by any means legally possible.

The factors potentially weighing in Sherman's favor include Debtor's pre-petition conduct, past bankruptcy filings, and honesty in representing the facts of this case.  While a debtor's honesty is essential to preserve the integrity of the bankruptcy system as a whole, these factors do not weigh entirely in Sherman's favor, and when considered in the context of the "totality of circumstances," the Court is not convinced that they sufficiently evidence a lack of good faith tipping the scales in Sherman's favor.  The prior litigation history between Sherman and Debtor is extensive, and to say there is bad blood between the parties would be an understatement.  Sherman appears to take the position that Debtor brought this substantial debt upon herself by breaching their medical purchase agreement and filing multiple appeals and bankruptcies, thereby stretching out the Michigan Litigation for over a decade while expensive attorney's fees and statutory interest

continued to accrue.  However, as the proverbial saying goes, "it takes two to tango," and the Court

questions why Sherman has kept pursuing Debtor for over 16 years in this "scorched earth" legal

battle when he has already collected approximately $300,000.00 and incurred more in legal fees

than he appears to have lost on his investment in Debtor's medical practice.[57]

Sherman also points to Debtor's history of "delay tactics," suggesting that her fainting

spells in court and repeated absence from creditor examinations were purposeful acts of defiance

meant to thwart Sherman.  Without hearing testimony from Sherman himself, it is difficult for the

Court to rely on his Michigan counsel's presentation of the facts, especially when it comes to

characterizations of the subjective intent behind an opponent's actions.  While the Court does not

condone Debtor's recorded violations of court orders and subpoenas, those acts do not take away

from the fact that Debtor has a plausible, good faith motivation for filing this case and proposing

this plan: to stay in her home.

In reviewing the docket in each of Debtor's prior bankruptcy cases, as well as the exhibits

Sherman provided summarizing the Michigan Litigation history, it appears that Sherman left no

stone unturned in his pursuit to collect on his claims against Debtor.  Some of Debtor's actions in

prior cases and litigation also seem to be in part responsive to Sherman's repeated attempts to

collect his judgment from Debtor's pension fund despite the strong congressional policy, caselaw,

and federal and state statutes safeguarding such retirement benefits from creditors.  Sherman's

domestication of the Michigan judgments and his counsel's indication that Sherman will likely

proceed with perfecting a judgment lien on Debtor's Residence further suggest that Debtor's fear

---

[57] The 2014 Judgment awarded Sherman $392,693.92 in attorney's fees and costs, and the 2019 Attorney's Fee Judgment awarded Sherman an additional $436,082.20 in attorney's fees and costs.  *See* POC No. 4-1, 14-15. Comparing the total damages awarded ($600,000) to the total attorney's fees and costs ($828,776.12), the Michigan Litigation legal fees, which do not account for Sherman's legal fees incurred in the ERISA litigation and Sherrod's bankruptcy cases, greatly exceed the damages incurred from the transaction.

that she will lose her home is an entirely reasonable explanation for her filing for bankruptcy. Notably, given Debtor's current financial situation and the laws protecting her retirement benefits, the proposed Amended Plan likely provides the best possible outcome for Sherman.  If this case is dismissed, Sherman can proceed with perfecting his judgment lien on Debtor's Residence, which his counsel has admitted will yield about as much benefit as Sherman will receive under the Amended Plan.  Moreover, it appears that Debtor's only other significant asset, the Pension Plan funds, may still be out of Sherman's reach outside of bankruptcy, either under ERISA, state exemption statutes, or the logic applied by the Illinois District Court in its order denying Sherman's Motion to Intervene in the ERISA Litigation.

Finally, the Court must consider how much weight to give the instances when Debtor has not been fully honest in representing the facts of this case.  As noted above, Debtor did not disclose one of her Michigan properties—the Doris Street Property—and her HOA fees in her Original Schedules.  While the Court does not condone a debtor's filing of incomplete schedules, in this case those omissions have been corrected, and no party has indicated that they were intentionally not reported.  As a matter of fact, the Doris Street Property was previously disclosed in prior bankruptcy schedules.  While testifying, Debtor also contradicted herself and the record at times, particularly in denying that she had ever refused to attend a creditor's examination when the Michigan Litigation documents included in Sherman's exhibits suggest otherwise.  Moreover, Debtor's demeanor observably changed when she started being questioned by Sherman's counsel, and her inability to remember certain events and her delay in finding exhibits that her counsel advised her to have printed and ready raised some suspicion.  It is clear to the Court that Debtor is not an easy client to deal with, as evidenced by the several withdrawals of counsel filed in the Michigan Litigation and ERISA Litigation, at least some of which were filed due to irreconcilable

differences.  With that said, the Court questions whether her demeanor and limited memory may be a result of her advanced age and health issues coupled with her conviction regarding her position that she is in essence being persecuted by Sherman.[58]  Though her honesty and behavior in this case have at times appeared questionable, the many medical issues Debtor has dealt with during this case and the poor condition of her residence evidenced in Herrin's Appraisal Report suggest her overall wellbeing is not in the best shape.

Considering the totality of the circumstances as outlined above, the Court finds that Debtor has met her burden to prove that the Amended Plan is confirmable under the standards of § 1325.

## II.    Feasibility

The Trustee raised some concerns about the feasibility of Debtor's proposed monthly plan payments due to the negative net monthly income reported in her amended Schedule J.  However, Debtor is current in her plan payments and the Trustee indicated that his office received confirmation that Debtor's HOA fee payments are up to date.  Additionally, Debtor testified that if there is ever shortfall, her family helps her out and she has some money left from her 2023 Pension Plan mandatory distribution with which she can pay the $250.00 that will come due before October 25, 2024, at which time the plan's success will depend entirely on whether Debtor receives the necessary funds from her Pension Plan interest.  For these reasons, the Court is satisfied that the Debtor's Amended Plan is feasible.

---

[58] During the hearing on June 6, 2024, Debtor referred to being thrown in jail and beaten.  Sherman's counsel asked her to clarify if it was Sherman who physically assaulted her, to which she gave an emphatic "yes."  Sherman's counsel followed up with more questioning by which it was clarified that Sherman did not physically assault Debtor. Additionally, in the original Michigan Litigation action, Sherman sued Debtor for libel and slander for statements she made to Garden City Hospital, the hospital at which Sherman performed his surgeries and Debtor was employed after she sold her practice.  Creditor's Ex. 1-5, 18.  Debtor subsequently filed a third-party complaint against Garden City Hospital for violating Michigan's Whistleblowers' Protection Act.  Creditor's Ex. 1-3, 3.

### III.    Alternative Request to the Extent the Amended Plan is Confirmed

In the event the Court confirmed the Amended Plan, Sherman alternatively requests that the Court, at a minimum, condition confirmation on a requirement that the proposed lump sum payment from the Pension Plan be made directly from AMI to the Chapter 13 Trustee so as to ensure that creditors will receive a disbursement in this case.  Sherman is essentially asking the Court to impose a transfer restriction on Debtor's interest in an ERISA-qualified plan.  Such action is impermissible under Fourth Circuit precedent.   In *McLean v. Central States, Southeast and Southwest Areas Pension Fund*, the Fourth Circuit reversed an order of the lower bankruptcy court that directed the administrator of an ERISA-qualified pension fund to transfer the debtor's pension payments to the Chapter 13 trustee.  762 F.2d 1204 (4th Cir. 1985).  The Fourth Circuit reasoned that because 11 U.S.C. § 541(c)(2) provides that transfer restrictions enforceable under applicable non-bankruptcy law are enforceable in bankruptcy, the debtor's interest in a pension fund subject to ERISA's anti-alienation provision was not property of the bankruptcy estate and therefore unreachable by a direct pay order.  *Id.* at 1208.  Accordingly, while Debtor's Pension Plan interest is still excluded from the bankruptcy estate, this Court may not order the diversion of Debtor's pension payments to the Trustee.  The Court therefore denies Sherman's request in the alternative for the condition to confirmation of Debtor's Amended Plan.

However, it is not clear to the Court why Debtor would require 30 days from receipt of the Pension Plan funds to remit the plan payment to the Chapter 13 Trustee.  Moreover, to the extent that Debtor seeks to sell or transfer her real estate properties, she is directed to seek prior approval of any such sale or transfer from the Court, on notice and a hearing.[59]

---

[59] Under the vesting provisions of the Amended Plan, use and responsibility for post-confirmation property of the estate is placed with Debtor and not the Chapter 13 Trustee; accordingly, the Court wants to clarify that in this case, Debtor is required post-confirmation, until the case is closed, to seek approval of the Court before any of her real property is transferred or sold.

**IT IS THEREFORE ORDERED** that Sherman's Renewed Objection to Confirmation is overruled and Debtor's Amended Plan filed April 24, 2024, shall be, and hereby is, confirmed. The provisions of the Amended Plan, however, are modified to specify in Section 2.4 that, absent further order of the Court, Debtor shall pay $295,791.67 to the Trustee within ten (10) days of receipt of the ERISA distribution or October 25, 2024, whichever is earlier.  Moreover, prior to transferring or selling any of her real estate properties post-confirmation, Debtor shall seek Court authorization on notice and a hearing.

**AND IT IS SO ORDERED.**

**FILED BY THE COURT**
**06/21/2024**



Elisabetta G. M. Gasparini
US Bankruptcy Judge
District of South Carolina

Entered: 06/21/2024